PORTLAND, The (LOWRY v.).    See Case No. 8,583.

PORTLAND (MERRILL v.).    See Case No. 9,470.

PORTLAND & K. R. CO. (SULLIVAN v.).    See Case No. 13,596.

PORTLAND MANUF'G CO. (WEBB v.).    See Case No. 17,322.

## Case No. 11,295.

### The PORTSMOUTH.

### [2 Bish. 56; [1] 1 Chi. Leg. News, 65.]

District Court, N. D. Illinois.    Nov. Term, 1868.[2]

ENTERING HARBOR—JETTISON.

1. The captain of a propeller having run more than a day without accurate means of determining his position, supposed that the port of Waukegan, which he reached during the night in a fog, was Chicago, his destination. In attempting to enter, at ordinary speed, he grounded, and jettisoned part of the cargo. There was no necessity on account of either sea or wind to make the harbor at once. No effort was made to get lighters. Held: The captain was guilty of negligence: 1st—In attempting to enter the harbor until certain of his location. 2d—In not advancing slowly and with the utmost skill and caution. 3d—In not attempting to save the cargo.

2. The owner of the cargo has a right to insist that the captain shall not with his vessel take the chance of entering a harbor of which he is not certain, and without necessity.

3. Mariners must be held to the exercise of all reasonable skill and prudence.

4. After a vessel is stranded, the captain is bound to take all possible care of the cargo.

Libel by the Salt Company of Onondaga for a quantity of salt jettisoned while the propeller was aground at the harbor of Waukegan.

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court; case unreported. Decree of circuit court affirmed by supreme court in 9 Wall. (76 U. S.) 682.]

Waite & Clarke, for libellant.
Rae & Mitchell, for respondents.

DRUMMOND, District Judge. The facts of this case are briefly these: The libellant, on the fourth day of October, 1866, shipped, at Buffalo, on board of the propeller Portsmouth, then bound for Chicago, two thousand barrels of salt, under a bill of lading in the usual form, and which declared that the dangers of lake navigation only were excepted.

The propeller, shortly after, left Buffalo, and, on the 9th day of October, arrived at the Fox Islands, in Lake Michigan, discharged some portion of the cargo there, took in additional cargo, and, on that evening, at about seven o'clock, left the islands, bound direct for Chicago, there being, at the time, a northeast wind, with considerable sea. The propeller kept her course that night and all the next day, the fog still continuing until about six o'clock in the evening, when, the fog lifting a little, a church steeple was discovered on the west shore of the lake, and what seemed to be a house. The captain supposed that this was Racine, in Wisconsin, and continued on his course up the lake upon that supposition.

Between two and three o'clock on the morning of the 11th, a light was discovered, and the sound of a whistle, which was supposed to be that of a tug, was heard, and the movement of cars upon the shore. It was concluded that this was Chicago. The propeller had passed by, and to the south of, the supposed port and turned round to the north with a view of entering the harbor. The fog still continued. They could not see their way before them. All that they saw was the light, and all that they heard was the sound of the whistle and the movement of the cars.

Upon this evidence they acted, and attempted to enter the port upon the presumption that it was Chicago. As they entered, the mate, who was forward—as they came very close to the pier—discovered that it was not the pier at the Chicago harbor, and gave immediate notice to the captain, who was on the pilot house. The propeller was backed, but, in a short time, struck upon the bottom; and it proved to be, not the port of Chicago, but that of Waukegan.

The clerk was immediately sent ashore, and dispatched to Chicago for a tug, which arrived at Waukegan in the afternoon of the 11th, the captain having, in the meantime, jettisoned a portion of a cargo and, among the rest, a quantity of salt belonging to the libellant—the propeller not having been removed from her position prior to the arrival of the tug. They were unable to get the propeller off until the following morning, when she proceeded on her voyage to Chicago, less that portion of the cargo which had been thrown overboard.

The rule upon this subject is this: If the loss happened by a peril of the lake, and it could have been avoided by the exercise of any reasonable skill or diligence at the time, the carrier shall not be excused, but shall be held liable. Ang. Carr. 167 et seq. The subject is very fully discussed by the supreme court of the United States, in the case of The Niagara v. Cordes, 21 How. [62 U. S.] 7, in which that court says, that losses arising from the dangers of navigation, within the exception ordinarily contained in bills of lading, such as in this case, are not those that are in any degree produced from the intervention of man: they are such as happen in spite of human exertion, and which cannot be prevented by human skill and prudence.

The question is, whether under the circumstances of this case the captain of the propeller acted with all the skill and prudence necessary. While admitting that the case is not entirely free from difficulty, I do not think that he did. It will be recollected that the only means the captain had to determine his position on the 10th, when they caught a glimpse of land, were the speed of the propeller and the land. At that time, the observation which was made was confessedly indefinite and indistinct. The captain supposed that it was Racine, because he thought that the propeller had made that progress during the day and the preceding night; not because there was anything in the aspect of the church spire or house that he saw to give character to the locality.

It may be doubted whether there was enough in the case to warrant the conclusion that the propeller had sailed that distance; as it is clear, from subsequent circumstances, she had not. But, without insisting on great strictness as to the actual progress the propeller had made in the meantime, from the Fox Islands up to six o'clock on the evening of the 10th, still, it is clear that there was not enough in the observation which had been made, together with the doubtful conclusion derived from the progress of the vessel, to justify those on board, absolutely, in the conviction that there was before them any particular place. The most that could be said was, that it was a matter of doubt; and in point of fact, the mistake that was made in the progress of the vessel must have been from thirty to forty miles; that is to say, they supposed they were thirty or forty miles nearer Chicago, on the evening of the 10th, than they actually were.

The time that they arrived at and were about to enter the supposed harbor of Chicago, was not far from three o'clock in the morning. The fog was still thick. The evidence they had that this was the port of Chicago, was confessedly vague and indefinite. There was nothing to justify them, absolutely, in the conclusion that it was Chicago. It is clear that those on board the propeller, although they thought they were entering the port of Chicago, still, were not certain that they were so doing. The question is, whether they were justified, under the circumstan-

ces, in taking the chances and acting upon the presumption that it was the port of Chicago.

As I have already said, I think that, under the circumstances of the case, with the evidence before them as to where they were, the hour of the morning and the state of the weather, they ought to have remained until the approach of light or the lifting of the fog rendered it certain where they were.

It is to be observed that there was no imperative necessity, either in the sea or the state of the wind, for their making the harbor. There was no great risk, either to the propeller or to the cargo, in remaining off the port where they were until it could be ascertained with certainty what their situation actually was.

Again, admitting that the captain was justified, under the circumstances, in attempting to enter the harbor on the suspicion that it was Chicago, I think that proper precautions were not taken. If they were justified in entering the harbor at all, the utmost caution and skill should have been used. They should have felt every step of the way. They should have advanced only with sufficient speed to give adequate and proper steerage way to the propeller. The engineer says that they were entering with the usual speed. The witnesses do not all agree upon this point; but I think it is manifest that they were advancing too rapidly at the time; and, it is apparent that, if they had exercised more caution, the risk to the vessel and cargo, even if they had struck, would not have been nearly so great as it ultimately proved to be. So that, on both grounds, I think there was not that degree of skill and prudence exercised that there ought to have been under the circumstances of the case.

It is true that something ought to be allowed to the opinion of the responsible party, whose duty it was to decide at the time— the captain of the propeller; but, while this is true, it must not be forgotten that there is also something due to the owner of the cargo, and that it is not just or right that the captain, in the exercise of the responsibility which devolved upon him, under circumstances like these, should take the chances which then, it was apparent, existed. There was a chance that it was the harbor of Chicago; there was a chance that it was not; the captain was not justified in taking this last chance.

I think it is the duty of the courts to hold mariners, under circumstances like these, to the exercise of all reasonable skill and prudence. Therefore it is that I hold the propeller accountable for the loss which occurred in this case. We excuse them if the loss happened from dangers of lake navigation; but it must be clear that the loss has happened in consequence of such danger. If it appears that the exercise of proper skill and prudence might have prevented the loss, then the carrier must be held responsible.

Again, I am not satisfied with the conduct of the captain after the vessel was stranded. The rule laid down by the supreme court of the United States in the case already referred to, is that, after the vessel is stranded, the master is bound to take all possible care of the cargo. When the vessel went ashore, the captain sent for a tug. No effort was made to get lighters. No attempt was made to save the cargo; but the cargo, or a portion of it, including the salt of the plaintiff, was thrown overboard and piled up upon the bottom, so that many of the barrels rose above the surface of the water, and were subsequently saved by parties, residents of Waukegan. There was a heedlessness, even a recklessness, on the part of the captain, in regard to the jettison of a portion of the cargo, which I hardly think, under the circumstances, can be justified.

But, inasmuch as some of the witnesses examined think that the captain was justified in the jettison that was made, I do not place the decree upon this ground. But my opinion is, that if proper exertion had been made, a part, if not the whole, of the cargo might have been saved. The vessel was not more than fifty feet from the pier; lighters might have been obtained, and certainly a portion of the cargo saved. And it will be recollected that the wind was subsiding and the sea falling.

Decree for libellant for the value of the salt, belonging to the libellant, which was thrown overboard.

NOTE. This case was then appealed to the circuit court, and Judge Davis, of the supreme court, sitting as circuit judge, adopted fully the opinion of Judge Drummond. [Case unreported.] The supreme court again affirmed the decision in 9 Wall. [76 U. S.] 682, q. v.